# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 29, 2014

## STATE OF TENNESSEE  v. JOSEPH EGAN UNDERWOOD

**Appeal from the Criminal Court for Knox County**
**No. 98678A      Bob R. McGee, Judge**

---

**No. E2013-01221-CCA-R3-CD - Filed March 6, 2014**

---

The defendant, Joseph Egan Underwood, appeals his Knox County Criminal Court jury convictions of first degree murder and especially aggravated kidnapping, challenging the sufficiency of the convicting evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Joseph Egan Underwood.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case relate to the kidnapping and murder of the victim, Richard Lucas, at the hands of the defendant and his girlfriend, Kimberly Anne Sutton.  The proof adduced at trial established that the defendant, Ms. Sutton, and the victim had been drinking at the victim's home when the victim and Ms. Sutton began to argue.  The argument escalated, and the victim pushed Ms. Sutton onto a bed and punched her.  The defendant became enraged and commenced beating the victim.  At some point, the victim was also stabbed in the neck and arm, his hands and feet were bound, and he was placed inside a blue plastic storage container, which was concealed in a locked shed behind the victim's house.  After stealing several items from the victim's residence, the defendant and Ms. Sutton fled.

In January 2012, the Knox County grand jury charged both the defendant and

Ms. Sutton with one count each of first degree premeditated murder, two counts each of felony murder, and four counts each of especially aggravated kidnapping.[1] The trial court conducted a jury trial in January 2013.

Officer Roger Simmons with the Knoxville Police Department ("KPD") testified that, on November 18, 2011, he responded to a domestic disturbance call at Tyson Park. When he arrived, Officer Simmons observed a man and woman, later identified as the defendant and Ms. Sutton, who "obviously had been in an argument," though neither appeared to have sustained any injuries and both appeared intoxicated. Upon learning the woman's identity and discovering that she was named in an outstanding warrant, Officer Simmons placed Ms. Sutton under arrest. While en route to the jail and apparently pursuant to a conversation with Ms. Sutton, Officer Simmons stopped at a Knoxville residence on East Morelia Avenue to conduct a welfare check on the homeowner, later identified as the victim. When Officer Simmons received no response to his repeated knocks on the front door, he proceeded to the rear of the residence where he discovered the back door was ajar. Officer Simmons confirmed that the residence was empty and then called for additional police units.

Officer Simmons and other KPD officers canvassed the neighborhood and determined that the victim had not been seen in at least four days. While Officer Simmons was at the victim's residence, he observed a shed with a small metal padlock in the western corner of the yard. He later transported Ms. Sutton to KPD headquarters.

KPD Officer Matt Peters testified that he, too, responded to the domestic disturbance call at Tyson Park on November 18. Officer Peters placed the defendant under arrest for public intoxication. Although the defendant was initially quiet, he later became "very panicky" and "agitated" and stated that "he had done things that would keep him locked up for a long time and that he would never get out of jail after they had found out what he did."

KPD Transportation Officer Rocky McCulloch testified that he encountered the defendant on November 18 while the defendant was seated in a "release area" waiting to be transported to KPD detectives for questioning. Another prisoner asked the defendant if he was about to be released, to which the defendant responded, "I'm probably never getting out of here."

Rebecca Byers, a KPD crime scene technician, testified that she processed the

---

[1] In their briefs before this court, both parties mistakenly state that the defendant was charged with both especially aggravated kidnapping and aggravated kidnapping. It is clear from the indictment, however, that the defendant was not charged with the latter offense.

crime scene at East Morelia Avenue on November 18. She testified that she discovered blood spatter in at least three different rooms in the residence, and she also found, in the front bedroom, "a Dawn bottle that had some bleach in it that had been used to clean up." Ms. Byers was able to ascertain that items in the house had been moved because blood was discovered behind and underneath items. She observed blood stains on the carpet in both the living room and a bedroom, and items had been placed on top of some of the stained areas. In the kitchen, Ms. Byers found empty tape dispensers and a tube of caulking.

Ms. Byers took dozens of photographs of the crime scene, which the trial court admitted into evidence. One photograph depicted the interior of the shed located behind the victim's residence and showed a blue blanket covering a rectangular object, which another photograph revealed to be the blue plastic storage container. Other photographs depicted the victim's decomposing body stuffed inside the container and showed tape binding together both his hands and his feet. The photographs also showed white caulk on the edges of the plastic container and on the victim's head. Photographs taken of the interior of the victim's house showed blood and blood spatter on various places throughout the victim's bedroom, living room, and kitchen. Ms. Byers also took photographs of a bottle of liquid detergent that contained bleach sitting on top of an armoire in the bedroom, and photographs depicted bleach stains on the furnishings below the bottle.

Ms. Byers described photographs taken of the interior of the plastic container, which was coated with blood, as well as photographs of the victim's clothing, which was covered in blood. The victim's hands were bound with blood-stained thermal pants, and the pants had been wrapped with packing tape. The victim's feet were bound with packing tape as well.

KPD evidence technician Danielle Weiberg testified that she was called to collect evidence located at a homeless encampment underneath an interstate bridge near 17th Street. She photographed and collected a knife that was located inside the tent of a black male.

KPD Investigator Patricia Tipton testified that she was called to the 17th Street underpass to locate the defendant's tent and camp site. Investigator Tipton photographed and collected various items, including sleeping bags, camping equipment, and a pair of women's size 7 athletic shoes.

Special Agent Keith Proctor with the Tennessee Bureau of Investigation Crime Laboratory testified as an expert witness in the field of deoxyribonucleic acid ("DNA") analysis. Special Agent Proctor testified that he obtained DNA profiles from the victim, the defendant, and Ms. Sutton, and he then compared those profiles to the evidence on file.

Special Agent Proctor matched the victim's DNA profile to the blood found throughout the victim's house on a variety of items in the bedroom, the living room, and the kitchen. Upon examination of the DNA evidence taken from the lid handles of the plastic storage container, Special Agent Proctor found the presence of the victim's DNA as well as that of "an undetermined minor contributor," which "may or may not" be the defendant.

KPD Investigator Jason Booker testified that he responded to the crime scene on November 18, 2011. When he arrived, he was informed that officers had discovered a dead body inside a storage container and that they had learned of the location of the body from Ms. Sutton. Investigator Booker then proceeded to the police department to interview Ms. Sutton. After speaking with Ms. Sutton, Investigator Booker interviewed the defendant. Investigator Booker described the defendant's demeanor as "fairly calm and level headed," and, although he was aware that the defendant had been arrested earlier that day for public intoxication, Investigator Booker did not believe the defendant to be under the influence of an intoxicant. The defendant signed a waiver of his constitutional rights after being provided *Miranda* warnings, and Investigator Booker proceeded to question the defendant about his involvement in the victim's death. The defendant explained that he had known the victim for approximately two months and that Ms. Sutton had introduced them. The defendant stated that he had last visited the victim's house "maybe a week ago" and confirmed that, during that visit, Ms. Sutton and the victim had "got[ten] into it."

> Q: What about?
>
> A: [The victim] was a little drunk . . . mou . . .mouthing off at the f***ing mouth and he got smart with me.
>
> Q: Well, did he get into it with you over [Ms. Sutton] or something else?
>
> A: He was just running his f***ing mouth and she told him to shut up. His exact words were, "well, you can get the f*** out, too."
>
> Q: He told her that?
>
> A: Yes sir; that's affirmative.
>
> Q: What happened after that?
>
> A: She walked into his bedroom to get her stuff; he

-4-

physically pushed her and punched her . . .

Q:     Oh, he punched her?

A:     Yes sir; it's a fact.  I physically lost my mother-f***ing mind and beat the mother-f***ing brakes off of him.

Q:     Because of what he did to her?

A:     Yes sir . . . I whipped his ass.

Q:     Was she there when . . . when you were fighting him?

A:     Yes sir.

Q:     Was she doing anything?

A:     No sir – not yet.

The defendant stated that the victim was bleeding and that he thought "his head was busted," but he was not unconscious.  The interview continued as follows:

Q:     Tell me as best detail you can . . . what happened?

A:     Okay.  He pushes her and hits her.  I f***ing spazz out; we've all been drinking; and I'm not using that as a f***ing crutch . . .

Q:     Naw.

A:     Okay.  I beat the f***ing living hell out of him.  I was just . . . f***ing spazz out.  I'm beating the brakes off this mother-f***er.  So, I let him r . . . I let him alone; getting ready to go.  Ms. Sutton just so happens to say, "He's calling your name.  He's . . . he's calling your name.  He knows who you are.  He'll press charges. They'll put you under the jail."  Let's go.  She didn't want to leave.  She said, "Well, let's just kill him."  I said, "I ain't f***ing killing him, you kill him."  If you'll notice, he's got a laceration to his f***ing throat . . . his

-5-

> throat. She stabbed the mother-f***er in the throat with a knife. Did I beat the f*** out of him, Investigator? Yes sir, I did. Did I kill him? No sir, I did not. Did I clean the . . . did I clean the crime[] scene up? No sir, I did not; Ms. Sutton did that. Did I drag him and put him in that f***ing shed? No sir, I did not. Ms. Sutton did that. Now here we are.

The defendant then informed Investigator Booker that he sold the knife to a "gentleman at the Mission" named Steve, and he told the investigator where he could likely locate the man. The defendant confirmed that the victim was conscious and "calling [his] name" after the beating, but he denied killing him, again stating that Ms. Sutton had stabbed the victim in the left side of his throat. The defendant stated that he and Ms. Sutton had placed the victim in the plastic storage container before Ms. Sutton stabbed him, explaining that his intention had been to place the victim in the bin "until he was all right and let him try to straighten up" but that Ms. Sutton "wasn't going for that." The defendant initially explained that he wrapped tape around the victim's hands "in the middle of while I was beating him up." He then stated that he stopped beating the victim upon determining that "he's had enough," but because the victim was "still bucking on me," the defendant decided to "tape[] his hands and his legs." The defendant stated that the knife Ms. Sutton used to stab the victim belonged to the victim, but he did not know where Ms. Sutton had found the knife. The defendant strenuously denied dragging the plastic container out of the house and into the shed, claiming that Ms. Sutton acted alone in that regard. The defendant estimated that the crime had occurred five or six days previously although he could not be certain. When asked whether he and Ms. Sutton had taken anything from the victim's house, the defendant admitted to taking a sleeping bag, "some shelter halves that makes tents," compact discs ("CDs"), digital video discs ("DVDs"), a pocket watch, a second knife, a "Gerber tool," and a belt buckle. The defendant stated that he had sold everything with the exception of the sleeping bag and the tents, which he stated were still at his camp site underneath the 17th Street overpass. The defendant also stated that Ms. Sutton's white athletic shoes, which she was wearing the night of the crime, could be found at his camp site. When Investigator Brooks asked if the defendant recalled anything the victim said to him, the defendant gave the following response:

> A: Well, he kept trying to buck on me. So that just enraged me f***ing more and more and more and more and more so I just committed just to beat the f*** out of him more and more and more and more and more . . . . . . . . . I like to fight; especially when a man that you treat f***ing good and like a brother and give every f***ing thing you

-6-

get and then he puts his hands on my old lady . . . that's grounds for f***ing "smash on sight." I smashed him on f***ing sight, by God. I didn't kill him; didn't stab him in the f***ing throat. She did. But I beat the f*** out of him and I was there. I didn't drag his f***ing dead, worthless corpse in the f***ing . . . in the shed. It was put in the pantry where I had it . . . but you see sweet, little old innocent, weak . . . weakly feeble-looking [Ms. Sutton], let me tell you something that's just a f***ing front, buddy. I didn't drag that f***ing corpse, Investigator, to that f***ing shed. Once he was f***ing dead and I seen he was dead, I put him in his pantry.

Q:     So did you put him in the . . . I know you said it was in the kitchen . . . the tub was in the kitchen, right?

A:     It had all these beer cans in it.

Q:     So you . . . did you dump 'em out?

A:     I . . . no ma'am . . . no sir, I did not. Ms. Sutton dumped the mother-f***er out.

Q:     Okay and then you put him in the tub . . .

A:     No sir; that's a negative. We put him in the tub . . . I bound his hands and his legs.

Q:     Okay, you bound his hands and his legs . . . both of you put him in the tub.

A:     We . . . both of us picked him up and put him in the tub.

Q:     He was stabbed; she stabbed him.

A:     She stabbed him 'bout 20 or 30 minutes later.

Q:     Twenty or thirty minutes later after he had already been in the tub?

A:    Yes sir.

Q:    Okay, so he just been . . .

A:    He was still alive when he was in the tub.

Q:    Was he saying anything or gurgling or moaning or . . .

A:    He was gurgling and moaning.  She said, "Finish him."

Q:    So she told you to finish him?

A:    Yes sir.  I said, "No ma'am, I'm not."

Q:    What did she say to that?

A:    She . . .  frankly, Investigator, you want . . . you want me to tell you . . . tell you exactly what she said?

Q:    Yeah.

A:    She said, "Well, how do I kill him?"

Q:    So she asked you how to kill him?

A:    Said, "F***, I don't know.  Stab him with something, break his f***ing neck, do . . . f***, I don't know."  She stabbed the mother-f***er in the neck.

At the conclusion of the interview, the defendant admitted to "beat[ing] the f*** out of" the victim but reiterated that he did not kill him.

Investigator Booker testified that he was able to locate the man known as "Steve," and Steve still had the knife in his possession that the defendant had sold to him a few days earlier.  Steve told him that, when he purchased the knife from the defendant, the defendant was selling other items to people "down at the mission."  Investigator Booker stated that the victim's hands and feet were bound in the same manner that the defendant had described, and officers located the defendant's camp site, which included the tents, sleeping bag, and white athletic shoes described by the defendant.

-8-

Doctor Christopher Lochmuller, Knox County deputy medical examiner, testified that he performed an autopsy on the victim on November 19, 2011. Doctor Lochmuller stated that, once the victim was removed from the plastic container and the victim's clothing was removed, he noticed "severe external injuries, particularly about the face" with "large areas of bruising on both sides of the face," multiple lacerations and skin scrapes on both sides of his face, and "a number of scrapes on his extremities." Doctor Lochmuller also noticed two stab wounds: one to his left forearm and one at the base of the neck on the left side. With respect to internal injuries, Doctor Lochmuller testified that the victim sustained fractures to his nose, the upper part of his mouth, and both cheeks; the victim's larynx had been crushed; his liver was torn; he had approximately 100 milliliters of blood in his abdomen; and he had sustained 13 rib fractures. Although the stab wound to his left arm went through "primarily skin and fat," the neck wound "went through some of the muscle and actually entered the left side of the larynx." Through the testimony of Doctor Lochmuller, the State introduced into evidence a number of autopsy photographs depicting the victim's injuries.

When asked if he had formed an opinion as to how long the victim had been deceased when his body was discovered, Doctor Lochmuller explained that the victim's exposure to cold November temperatures likely delayed his decomposition, which made it difficult to discern the time of death. Doctor Lochmuller admitted that the time of death "could be as long as" four to seven days. Doctor Lochmuller did not notice any bruising or marks on the victim's hands, but he testified that the stab wound on the victim's arm could be consistent with a defensive wound. With respect to the stab wound to the neck, Doctor Lochmuller stated that it alone could "cause bleeding into the airways," which could "lead to asphyxia and death." The doctor testified that the victim's facial injuries "were in and of themselves survivable," stating that the victim had not sustained any skull fractures. Doctor Lochmuller opined that the cause of death was multiple blunt force injuries and stab wounds, which contributed to blood loss and asphyxiation.

Although Doctor Lochmuller could not determine the sequence of the injuries inflicted on the victim, he testified that the victim was alive when he was placed in the plastic container. He based this opinion on both "the presence of blood in the container" and "the fact that the blood in the container was clotted," which he explained is only possible when the victim is still alive. Doctor Lochmuller also opined that the victim "sustained all the injuries prior to being placed into the container." When asked which of the victim's wounds were lethal, Doctor Lochmuller responded as follows:

> All of his wounds together, it's the combination of all of them
> that come together to cause his death. But the ones that would
> be the most serious or likely to die from if you don't seek

medical therapy quickly would be the stab wound to the left side of the neck, the crushing injury to the larynx, and potentially the tearing of the liver. It could – it bled some, so he died before it became a problem, but it's something that could potentially have a lethal amount of bleeding from. So at least those three, that all of them together, all the blood loss from the tearing, you know, from all the lacerations, it all adds up.

Doctor Lochmuller testified that the victim's blood alcohol level was 0.19 and that he was "otherwise a healthy individual." The doctor stated that the victim was five feet six and three-quarter inches in height, he weighed 123.5 pounds, and he was 52 years of age.

On cross-examination, Doctor Lochmuller admitted that he could not say with any degree of medical certainty whether the victim was conscious or unconscious when he was placed in the plastic container.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected to testify.

The defendant testified that he was 29 years of age and that he had been homeless for "[a]pproximately two and a half years off and on." The defendant stated that he met Ms. Sutton in July 2011. She was homeless as well, having just been released from prison, and the two began dating. Approximately two months later, Ms. Sutton introduced the defendant to the victim as "a family friend," and both Ms. Sutton and the defendant lived with the victim for two to three weeks. The defendant moved out when he and Ms. Sutton broke off their relationship, and the defendant resumed living on the streets while Ms. Sutton briefly moved to Florida.

The defendant and Ms. Sutton kept in touch, and when Ms. Sutton returned to Knoxville, the defendant met her at the bus station, and the two of them attended the local Veterans Day parade. After spending one night in a hotel, they briefly stayed on the streets until Ms. Sutton decided to return to the victim's house to retrieve some clothing she had left there. The defendant testified that when they arrived at the victim's house, the victim was happy to see them, and the defendant stated that he had no intention of harming the victim or stealing from him at that time. The defendant, Ms. Sutton, and the victim talked while consuming the defendant's liter of bourbon. The defendant and the victim then walked to a nearby liquor store and purchased a pint of bourbon. They returned to the victim's house and drank the pint of bourbon with Ms. Sutton, at which time all three were "extremely drunk." The defendant testified that, at that time, the victim "began to get an attitude" and

started "murmuring things under his breath." The victim and the defendant began to argue, and Ms. Sutton told the defendant that he should leave. The defendant became emotional because he did not want to leave Ms. Sutton, and Ms. Sutton told the defendant to stay, which prompted the victim to become angry. Ms. Sutton asked the victim "not to disrespect" the defendant, and the victim told her to "get your s*** and get the f*** out too, b****."

Ms. Sutton proceeded into the bedroom to gather her things, and the victim followed her, grabbed her by the shoulders, and shoved her onto the bed. Before Ms. Sutton could stand up, the victim "punched her in the face." The defendant testified that he became "enraged" because "this man assaulted and punched my girlfriend whom I loved." The defendant stated that he walked into the bedroom and punched the victim in the face, which caused the victim to fall to the floor. The defendant testified that he allowed the victim to stand, thinking that the altercation was over, but the victim then "charged [him] into the armoire" and hit him in the stomach, causing the defendant to double over. The defendant was wearing a suit and tie, and the victim grabbed the defendant by his tie and tried to choke him. The fight continued in the bedroom, eventually spilling out into the living room. The defendant admitted that, at some point, the victim stopped fighting, but he continued to beat the victim, explaining that he was "so enraged" that he "couldn't help" himself.

The defendant testified that he eventually stopped beating the victim, and when he saw the victim's condition, he thought, "Oh, God, I've killed this man." When asked why he thought the victim was dead, the defendant responded that the victim was not moving or making any sounds, and it appeared to the defendant that the victim was not breathing. At that time, the defendant "panicked and freaked out and figured if I hide the body I won't get in trouble." The defendant and Ms. Sutton placed the victim in a plastic storage container they found in the victim's kitchen. Because they were struggling to make the victim's body fit inside the container, the defendant bound the victim's "hands and legs together so [he] could get the lid on the tote." The defendant testified that Ms. Sutton stabbed the victim while he was inside the container and claimed that he had "no idea why she would stab a dead body."

The defendant stated that, after he placed the lid on the container, he moved the container into the pantry while Ms. Sutton attempted to clean the crime scene. Later, Ms. Sutton stated that the pantry "wasn't a good enough spot" and that the victim should be moved outside. The defendant admitted that, before they left the victim's house, he and Ms. Sutton stole "a couple of DVDs, a couple of CDs, a pocket watch, and some Dale Earnhardt cards, along with two knives." He denied any intent to steal from the victim prior to placing the victim in the plastic container.

After leaving the victim's house, the defendant and Ms. Sutton sold some of

-11-

the items they stole and then patronized a liquor store. The defendant estimated that he and Ms. Sutton spent "approximately a week" on the streets before they got into an argument in Tyson Park over Ms. Sutton's desire to engage in prostitution and were both arrested for public intoxication.

The defendant admitted that, when he was interviewed by Investigator Booker, he claimed that the victim was alive when he was placed in the storage container, but he testified that he had lied because he "was scared to admit it to Mr. Booker that I beat [the victim] to death." The defendant confirmed that he had beaten the victim to death and denied that the victim was alive when he put his body in the plastic container. When asked why he had told Investigator Booker that Ms. Sutton had killed the victim, the defendant stated "[b]ecause I witnessed this woman stab a dead man that was in a Tupperware container, and this woman was going to go prostitute herself," which indicated to him that she "cared nothing about me."

On cross-examination, the defendant admitted that the version of events he had just testified to was "significantly different" than what he had told Investigator Booker on November 18, 2011. With respect to the victim's injuries, the defendant admitted that he caused the compound fracture to the victim's nose; broke both of his cheek bones; caused lacerations to his face; broke the upper palate of his mouth; broke 13 of his ribs; caused the laceration to his liver; and caused the tearing around his ears. The defendant agreed that the victim's blood was found in three separate rooms of the victim's house, and he agreed that he had beaten the victim in each of those three rooms. The defendant denied wrapping the victim's hands in thermal pants, claiming that he wrapped them only with tape and opining that "someone" must have removed the tape from the victim's hands, wrapped the hands in thermal pants, and then reapplied the tape over the pants. The defendant admitted to taking items belonging to the victim when the defendant and Ms. Sutton left the house. When asked about Doctor Lochmuller's testimony that the victim was stabbed in the throat prior to being placed in the plastic tub, the defendant responded that the deputy medical examiner "wasn't at [the victim's] house that evening."

Based on this evidence, the jury convicted the defendant as charged of first degree murder, felony murder in perpetration of a kidnapping, felony murder in perpetration of a theft, and four alternative counts of especially aggravated kidnapping. The trial court merged the two felony murder convictions with the first degree murder conviction and imposed an automatic sentence of life imprisonment. Following a sentencing hearing, the trial court merged the four jury verdicts of especially aggravated kidnapping into a single conviction and imposed a 23-year sentence to be served concurrently to the defendant's life sentence.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends only that the evidence adduced at trial was insufficient to support his convictions.

As an initial matter, we note that the defendant came close to waiving our consideration of this issue for failure to properly support his argument with citation to authorities. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The defendant's brief contains only citations to the three statutes at issue and a single case which sets forth this court's standard of review when analyzing a challenge to the sufficiency of the evidence. Although the defendant's list of authorities is wanting, we will nonetheless address his argument.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

*First Degree Premeditated Murder*

First degree murder, as charged in this case, is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). As used in the statute,

> "premeditation" is an act done after the exercise of reflection
> and judgment. "Premeditation" means that the intent to kill

-13-

must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); *see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the proof adduced at trial overwhelmingly established that the defendant savagely and severely beat the victim throughout three separate rooms of the victim's house. The defendant admitted that, even after the victim stopped fighting back, he continued the beating, and he told Investigator Booker that "in the middle of while I was beating [the victim] up," he bound the victim's hands and feet with tape. Although the defendant denied stabbing the victim, claiming instead that Ms. Sutton stabbed the victim after the victim had been placed inside the plastic container, Doctor Lochmuller testified that all of the victim's injuries had been inflicted prior to the victim's being placed into the container. As this court has previously stated, "[i]t is the jury's province, as the trier of fact, to determine which parts of the testimony and evidence to credit, and there is no requirement that a jury must wholly accept or reject a witness's account of events." *State v. Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Knoxville, Dec. 9, 2004) (citing *State v. Bolin*, 922 S.W.2d 870, 876 (Tenn. 1996)). Doctor Lochmuller opined that the victim died from a combination of "the stab wound to the left side of the neck, the crushing injury to the larynx, and potentially the tearing of the liver." Following the beating and restraint of the victim, the defendant and Ms. Sutton stole items from his home, some of

which they sold that very evening prior to purchasing liquor from a liquor store. The infliction of countless and repeated blows on an unarmed victim, the particular cruelty of the killing, and the defendant's calmness after the killing support a finding that he did so intentionally and with premeditation.

*Felony Murder*

As charged in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft [or] kidnapping." T.C.A. § 39-13-202(a)(2). Kidnapping is "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." *Id* § 39-13-303(a). Finally, "[a] person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a).

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." *Buggs*, 995 S.W.3d at 106 (citing *Farmer*, 296 S.W.2d at 884; *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" *Id.* (quoting *Buggs*, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the *res gestae* thereof, or where the homicide is so linked to the felony as to form one continuous transaction." *Buggs*, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d

*Homicide* § 67 (1999)). "The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)). When the predicate felony is theft, the killing must be "closely connected to the initial taking of the property in time, place, causation, and continuity of action." *See Pierce*, 23 S.W.3d at 296 (citation omitted).

With respect to the conviction of felony murder in perpetration of kidnapping, the proof at trial established that the defendant, by his own admission, bound the victim's hands and feet with tape and then continued his beating of the victim. The fact that the thermal pants wrapped around the victim's hands underneath the tape were soaked with blood indicated that the victim was still alive when he was bound. The defendant also admitted to placing the defendant inside the plastic container. Doctor Lochmuller testified that both the blood in the container and the fact that the blood was clotted indicated that the victim was still alive when he was placed in the container. The evidence supports the defendant's conviction of felony murder in perpetration of kidnapping.

With respect to the defendant's conviction of felony murder in perpetration of a theft, the defendant admitted that, after beating the victim and confining him inside the plastic container but before leaving the victim's property, he and Ms. Sutton stole numerous items from the victim's house. This theft was clearly "closely connected" in "time, place, causation, and continuity of action" to the murder of the victim, *see id*, and, thus, the evidence supports the defendant's conviction for this offense as well.

*Especially Aggravated Kidnapping*

Although the defendant does not directly raise the issue of the sufficiency of the convicting evidence of especially aggravated kidnapping, he does generally challenge the sufficiency of the evidence, and we will thus address these convictions as well. "Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302: . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . or . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-305(a)(1), (4). In this case, the defendant was charged with and convicted of four alternative counts of especially aggravated kidnapping, alleging removal of the victim accomplished with a deadly weapon; confinement accomplished with a deadly weapon; removal resulting in serious bodily injury; and confinement resulting in serious bodily injury. The proof adduced at trial established that the defendant bound the victim's

-16-

hands and feet and placed him inside a plastic storage container, which was later sealed shut and concealed inside a locked shed. Doctor Lochmuller testified that all of the victim's injuries, which would include the savage beating and the stabbing with the knife, a deadly weapon, had been inflicted prior to the victim's being placed inside the plastic container. Although the defendant denied stabbing the victim, the jury was free to reject this testimony. *See Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD, slip op. at 6. Thus, the evidence established that the victim was both removed and confined by use of a deadly weapon, and such removal and confinement clearly resulted in serious bodily injury. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's convictions of especially aggravated kidnapping.

In conclusion, the evidence is sufficient to support the defendant's convictions of first degree murder, felony murder, and especially aggravated kidnapping. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE